UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STATE OF CONNECTICUT     :    3:19 mj 1433 RMS

                                     :

                                       :    ss: City of New Haven

COUNTY OF NEW HAVEN     :

OCT 1 2019 AM5:43
FILED-USDC-CT-NEW.HAVEN

### AFFIDAVIT

I, Joshua Cameron, having been duly sworn, state:

     1.      I am a deputized Task Force Officer with the U.S. Drug Enforcement

Administration (DEA) and am currently assigned to the New Haven District Office Organized

Crime Drug Enforcement Task Force (NHDO). I have been a DEA Task Force Officer for

approximately 8 years. I have also been employed as a Police Officer with the Hamden (CT)

Police Department since February 2004. I have received instruction relative to conducting drug

investigations while attending the DEA Basic Narcotics Investigators Course in Franklin,

Massachusetts, and while attending in-service training at the Connecticut Police Academy

(POSTC) in Meriden, Connecticut.

## I. TRAINING AND EXPERIENCE OF THE AFFIANT

     2.      During my tenure as a Police Officer and as a Task Force Officer, I have

participated in numerous criminal investigations, including investigations into suspected

narcotics trafficking. I have written and executed search warrants, which have resulted in the

seizure of illegal drugs and evidence of drug violations. Over the past fifteen (15) years in law

enforcement, I have executed seizure warrants which have resulted in the seizure of assets

acquired with drug proceeds and assets utilized to facilitate drug activities. I have participated in

numerous investigations involving individuals suspected of distributing illegal drugs, purchased

illegal drugs, while acting in an undercover capacity, from targets of state and federal drug

investigations, coordinated controlled purchases of illegal drugs utilizing confidential

informants, cooperating witnesses and undercover police officers, written, obtained and

coordinated the execution of search and arrest warrants pertaining to individuals involved in the

distribution of illegal drugs, conducted electronic as well as physical surveillance of individuals

involved in illegal drug distribution, analyzed records documenting the purchase and sale of

illegal drugs, provided testimony in Grand Jury proceeding, and spoken with informants and

subjects, as well as other local, state and Federal law enforcement officers, regarding the manner

in which drug distributors obtain, finance, store, manufacture, transport, and distribute their

illegal drugs. I have also supervised the activities of cooperating witnesses who have provided

information and assistance in the federal prosecution of drug and weapon offenders.   In

addition, I also receive periodic in-service training relative to conducting drug investigations. As

such, I am familiar with the behaviors, methods and common practices of persons and

organizations that illegally traffic and distribute controlled substances, as well as the devices

commonly utilized by them.   Since 2010, I have participated in multiple Title III wiretap

investigations and have served as a co-case agent on many such investigations that spanned

many months and which led to the arrest and conviction of hundreds of defendants for violations

of federal narcotics laws.

     3.     As a result of my training and experience, I am familiar with the manner in which

controlled substances are commonly imported, manufactured, processed, packaged and

distributed.   I know the relative wholesale and retail value of various types of controlled

substances.   For example, I know that heroin is commonly distributed at the street level in

"bundles."   A "bundle" consists of ten, single dosage unit bags of heroin that are bundled or tied

together, with each bag containing between .02 and .03 grams of heroin.   Single-dosage unit

bags are often "stamped" with a brand name that is familiar to a particular distributor's customer base.   A "brick" of heroin consists of five (5) "bundles" (i.e., 50 single dosage unit bags).   The term "clip" is sometimes used to refer to ten "bundles" of heroin (i.e. 100 single dosage unit bags), and sometimes used to refer to five "bundles" of heroin. Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets.   From my experience, I am familiar with many of the code words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics.

4.      During the course of my employment in law enforcement, I have participated in numerous narcotics trafficking and violent street gang investigations.   In connection with these narcotics trafficking and violent street gang investigations, I have conducted physical and electronic surveillance, debriefed narcotics traffickers, gang members and informants, have been the affiant on affidavits in support of arrests warrants and search and seizure warrants, and have executed numerous arrests warrants and search and seizure warrants.   I have also participated in wiretap investigations and have been the affiant on affidavits in support of applications seeking authorization to intercept communications pursuant Title III, which have been approved by the district court.

5.      As a result of my training and experience, I am familiar with the behaviors, methods and common practices employed by drug traffickers and violent street gang members, including but not limited to those discussed below.

6.      I am familiar with the paraphernalia and devices commonly utilized by narcotics traffickers.

7.      I am familiar with and have analyzed records documenting the illegal purchase of and sale of controlled substances.

8.      I am familiar with the practices commonly employed by narcotics traffickers and gang members to avoid detection by law enforcement.

9.      As indicated above, during my tenure as a law enforcement officer, I have investigated and participated in numerous operations which involved drug trafficking violations. Search warrants relating to these investigations have covered cellular phones and computer devices used by drug traffickers to conduct their business, vehicles utilized by drug traffickers and their co-conspirators, residences of drug traffickers and their co-conspirators, premises and residences used by narcotics traffickers to process, "cook," and package narcotics for re-distribution, stash houses used as storage locations for controlled substances and drug proceeds, locations used as points of distribution for controlled substances, safe deposit boxes, and businesses and offices used by drug dealers as fronts to legitimize their unlawful drug trafficking.

10.      I am an investigator or law enforcement officer of the United States within the meaning of Title 18, United States Code, § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for federal felony offenses. I am a participating member of the DEA New Haven District Office Organized Crime Drug Enforcement Task Force, which is comprised of personnel from the DEA, the United States Marshals Service ("USMS"), the New Haven Police Department ("NHPD"), the West Haven Police Department ("WHPD"), the Hamden Police Department ("HPD"), the Branford Police Department ("BPD"), the Meriden Police Department ("MPD"), the North Haven Police Department ("NoHPD), the East Haven Police Department ("EHPD") and the Ansonia Police Department ("APD").

## II. DESCRIPTION OF THE SEARCH WARRANT LOCATIONS

11.    I submit this affidavit in support of warrants to search the following cellular telephones, which were seized from Keith Jordan and Katina Reed in Wolcott, CT on March 20, 2019. The DEA seized these cellular telephones and they are currently in the custody of the DEA. These cellular telephones are described as:

      a.  **Target Telephone 1:** Apple iPhone, which utilized number 347-742-9292; IMSI: 310120067855060; which is currently in DEA custody as Exhibit N-60.

      b.  **Target Telephone 4:** Apple iPhone, which utilized number 203-982-4441, which is currently in DEA custody as Exhibit N-61.

12.    The warrants in support of which I submit this affidavit would authorize the forensic examination of Target Telephones 1 and 4 for the purposes of identifying electronically stored information particularly described herein and in the attachment hereto.

13.    I have personally participated in this investigation and I am familiar with the facts and circumstances of the offenses described in this affidavit. The statements contained in this affidavit are based upon my personal knowledge, on information provided by Special Agents and Task Force Officers of the DEA, FBI and the Waterbury Police Department on information developed through consensual recordings, controlled purchases of narcotics and physical surveillance, review of wire and electronic communications intercepted pursuant to orders of the District Court, information provided by confidential informants and cooperating witnesses, analysis of telephone call detail records and telephone subscriber information, on review of department of motor vehicles and court records, and my training and experience and that of other Special Agents and Task Force Officers of the DEA and other law enforcement personnel. Since this affidavit is being submitted for the limited purpose of the aforementioned warrants, I have not included each and every fact I know concerning this investigation. I have set forth only

the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested warrants.

## III.   THE CHRONOLOGY OF THE COURT-AUTHORIZED INTERCEPTIONS

14.     On September 28, 2018, United States District Judge Michael P. Shea authorized the interception of wire and electronic communications occurring over Target Telephone 1, subscribed to Katina M Reed, 1202 Baldwin St Apt 2, Waterbury, CT 06706, and serviced by Sprint, a wireless telephone service provider and was being utilized by Keith JORDAN a.k.a. "KNOWLEDGE" for a period of thirty (30) days. Accordingly, interception of communications occurring over Target Telephone 1 commenced on September 28, 2018, and was discontinued on October 25, 2018. On October 25, 2018, United States District Judge Michael P. Shea authorized continued interception of wire and electronic communication occurring over Target Telephone 1 for a period of thirty (30) days. On October 25, 2018, interception of communications occurring over Target Telephone 1 commenced and were discontinued on November 21, 2018. On November 21, 2018, United States District Judge Michael P. Shea authorized the continued interception of wire and electronic communications occurring over Target Telephone 1 for a period of thirty (30) days. Accordingly, interception of communications occurring over Target Telephone 1 commenced on November 21, 2018 and ceased on December 12, 2018.

15.     Target Telephone 2 is a cellular telephone assigned telephone number 203-982-6572, IMSI 310260331239070, ("Target Telephone 2"), which is assigned to a pre-paid cellular telephone serviced by T-Mobile, subscribed to Domingo Alvez, 14 Long Hill Rd, Waterbury, CT 06704-3709 and is being utilized by DOMINGO ALVES a.k.a. "MINGO."

16.     On October 25, 2018, United States District Judge Michael P. Shea authorized the interception of wire and electronic communications occurring over Target Telephone 2 for a

6

period of thirty (30) days.   Interception of communications occurring over Target Telephone 2

began on October 25, 2018, and ceased on November 23, 2018.

17.     Target Telephone 3 is a cellular telephone assigned telephone number 347-340-

8172, IMSI 310120239329164, which is assigned to a pre-paid cellular telephone serviced by

Sprint, with subscriber in the name to "Mike Price," PO Box 15955, Lenexa, KS 66285, which

was being utilized by Pedro SANTOS a.k.a "PRIMO."

18.    On November 21, 2018, United States District Judge Michael P. Shea authorized the

interception of wire and electronic communications occurring over Target Telephone 3 for a

period of thirty (30) days. Accordingly, interception of communications occurring over Target

Telephone 3 commenced on November 21, 2018, and was discontinued on December 19, 2018.

On December 19, 2018, United States District Judge Michael P. Shea authorized continued

interception of wire and electronic communication occurring over Target Telephone 3 for a

period of thirty (30) days. On December 19, 2018, interception of communications occurring

over Target Telephone 3 commenced and was ceased on December 30, 2018 after SANTOS

turned off Target Telephone 3 after he was arrested by the Waterbury Police Department on

behalf of the DEA New Haven Office.

## IV. OVERVIEW OF THE CHARGED CONSPIRACY AND THE JORDAN INDICTMENT

19.     In February 2018, a Confidential Source ("CS") provided DEA with information

regarding a black male known to him/her as "Knowledge", subsequently identified as Keith

JORDAN of Waterbury, CT.   CS is cooperating in the hope that a third party who faces criminal

charges will receive consideration in the disposition of those charges.   Information provided by

CS has been corroborated by controlled purchases and through wire intercepts and other

investigative steps taken in this investigation.   CS stated that JORDAN is a mid to upper level

distributor of heroin and cocaine in Waterbury, CT.   CS stated that JORDAN claimed to have

access to kilogram quantities of heroin and asserted he could supply CS with heroin for $58 per

gram.   CS stated that he/she believed JORDAN to be sourced with bulk quantities of narcotics

through his wife's (Katina Reed's) family members who reside in the Virginia area.   CS stated

he/she was in a position to make controlled purchases of heroin from JORDAN as needed.   CS

further stated that a Hispanic male known as "Mingo", later identified by case agents and CS as

Domingo ALVES of Waterbury, CT, is an alternate heroin source of supply to JORDAN.   CS

stated that he/she believes ALVES, in turn, has a source of supply who provides him with up to

500 grams of heroin at a time.

　　　　20.   On July 12, 2018, CS conducted a buy from JORDAN for 16.2 grams of heroin as

confirmed by DEA lab analysis.   CS also laid the groundwork in this meeting for the

introduction of a DEA Undercover officer ("UC").   On July 18, 2018, CS and UC met with

JORDAN and conducted a buy for 50.75 grams of heroin (net as confirmed by lab analysis).

Thereafter, the UC conducted additional heroin buys from JORDAN on August 1, 2018 (50

grams), August 14, 2018 (53.9 grams) and September 12, 2018 (99.8 grams).   The suspected

narcotics acquired were all confirmed to be heroin by DEA lab analysis.

　　　　21.   On September 28, 2018, DEA began a wiretap of JORDAN'S phone (Target

Telephone 1).[1]   Intercepts confirmed that JORDAN was involved in the distribution of heroin

and, to a lesser degree, cocaine to both re-distributors and end users.   JAMES TYRONE

HAYES, among others, is a street level distributor supplied by JORDAN.   The intercepts

frequently referenced terms unique to heroin distribution such as bags, bundles, "buns," and

_____

1 Unless indicated otherwise, all of JORDAN'S intercepted communications described in this affidavit occurred
over Target Telephone 1.

bricks.   The intercepts also contained frequent references to prices being charged which were

consistent with typical per gram heroin prices and also references to quantities.   The intercepts

coordinated with surveillance confirmed that Brian HANNA was JORDAN'S primary source for

re-supplies of heroin.   Intercepts also revealed that JORDAN also obtained heroin from two

local Waterbury-based suppliers, Domingo ALVES and Pedro SANTOS.   Intercepts also

confirmed that CARLOS MORAIS was a cocaine source of supply to JORDAN.   Both

SANTOS and MORAIS had their phones tapped and the intercepts revealed that MORAIS is

supplied by JEAN CARLOS FABAL-GONZALEZ and SANTOS is supplied by LARRY

HALL.   Subsequently, FABAL-GONZALEZ'S and HALL'S phones were also the subject of

interception.   During intercepts, investigators determined that HALL supplied JERMAINE

FOSTER and JUNIO ACEVEDO and that, in turn, ABREU-BAEZ was HALL'S source of

supply.

      22.     There were a number of seizures during the course of the wiretap investigation

that corroborated the conclusions drawn from the wire intercepts, including the following:

- On October 26, 2018, Kendell Jordan and Kent Jordan obtained a quantity of heroin from Katina Reed after contacting KEITH JORDAN and being directed to see Reed at 66 Wakelee Avenue, Apartment 10, Wolcott, Connecticut ("Subject Premises 1") to obtain the heroin.   Kent Jordan picked up the heroin inside Subject Premises 1 from Reed and provided it to Kendell Jordan, who was waiting outside Subject Premises 1.   Kendall Jordan then conducted the transaction with a third party in front of Subject Premises 1.   Following the transaction, Waterbury PD executed a traffic stop and found the third party in possession of hypodermic syringes and 70 bags of heroin stamped "Say Less."

- On November 3, 2018, James Tyrone Hayes asked JORDAN for "4" JORDAN agreed and departed from Subject Premises 1 to meet HAYES. Surveillance observed them meet at Danbury Mall and JORDAN got into HAYES' car with a bag.   Jordan then got out minutes later and they both departed the area.   HAYES was pulled over by New York State Police on I-84 and troopers located 4 bricks (200 bags) of heroin stamped "Say Less" in the vehicle.

- On November 13, 2018, Keith JORDAN agreed to provide a third party with a quantity of heroin.   Surveillance observed JORDAN depart from Subject Premises 1 and then observed JORDAN and the third party meet at a Shop Rite parking lot in Wolcott, where the third party got into JORDAN'S car.   After the third party got back into his own car and left, Waterbury Police pulled him over and found him in possession of 14 bags of heroin stamped with the logo "the Hulk."   Intercepts indicated that JORDAN had obtained this brand of heroin from Pedro SANTOS..

- On December 1, 2018, intercepts between Keith JORDAN and Katina Reed indicated JORDAN intended to travel to the Bronx to meet Brian Hanna to obtain a re-supply of heroin.   JORDAN departed from Subject Premises 1.   Surveillance observed the meeting in the Bronx and DEA agents conducted a traffic stop in Ansonia, CT as Jordan was on his way back to Waterbury.   During the stop, case agents seized 3250 bags (65 bricks) stamped "Mullah" from JORDAN'S trunk.

23.    On March 13, 2019, a federal grand jury returned an indictment in the United States District Court for the District of Connecticut captioned *United States v. Keith Jordan et al*, 3:19CR74 (JCH) ("the Jordan Indictment") charging the following individuals: KEITH JORDAN, a.k.a. "Knowledge," KATINA REED, a.k.a. "Tina," BRIAN HANNA, a.k.a. "Zo," KENDELL JORDAN, DAMON DAVIS, TIMOTHY BOOKER, a.k.a. "Book," TYRELL CAMPBELL, a.k.a. "Bricks", KENT JORDAN, a.k.a. "KJ" & "Curtis", JAMES TYRONE HAYES, a.k.a. "Ty," DOMINGO ALVES, a.k.a. "Mingo," LANCE BAPTISTE, CARLOS MORAIS, a.k.a. "Los," JEAN CARLOS FABAL-GONZALEZ, JORDAN JAMISON, PEDRO SANTOS, a.k.a. "Primo", LARRY HALL, a.k.a. "Chuito" and "Bobo", BIENVENIDO JIMENEZ-GONZALEZ, a.k.a. "Toto", JERMAINE FOSTER, ROSEMARY COLON, MICHAEL ALTIERI, OMAR HERNANDEZ, LLIVER FRANCISCO ABREU-BAEZ, a.k.a. "Papi" and "ABREU," SUNJI CRAMER, VINA FRAZIER, DAVID FLAHERTY, FRANCISCO LOPEZ, JUNIO ACEVEDO, NAZARIEL GONZALEZ, and JOSE GONZALEZ a.k.a "Checo" with Conspiracy to Distribute, and to Possess with Intent to Distribute, Heroin and

Cocaine from July 2018 through March 2019 in violation of 21 U.S.C. Sections 841(a)(1) and

846.   KEITH JORDAN, ALVES, SANTOS, HALL, and ABREU-BAEZ are all the subject of a

quantity allegation of 1 kilogram or more of heroin.   FOSTER and ACEVEDO are charged with

a quantity of 100 grams or more of heroin.   JORDAN, SANTOS, MORAIS, HALL, FABAL-

GONZALEZ and ACEVEDO are also charged with 500 grams or more of cocaine.

## V.      PROBABLE CAUSE

### Keith JORDAN and Katina Reed Utilized Target Telephones 1 and 4 in Furtherance of

### Drug Distribution

24.    On July 12, 2018, CS purchased approximately 18 grams of heroin from JORDAN

for $1,000.   More specifically, at approximately 4:00 P.M., CS placed a phone call to JORDAN

at Target Telephone 1 in the presence of DEA TFOs Michael Paleski and Joshua Cameron.   CS

told JORDAN that he/she wanted to purchase $1,200 worth of heroin and they agreed to meet at

1202 Baldwin Street in Waterbury, JORDAN'S then residence.   CS-1 then traveled to the

meeting location and arrived at approximately 4:25 P.M.   After arriving, CS called JORDAN at

Target Telephone 1 to advise that he/she had arrived.   At approximately 4:42 P.M., JORDAN

exited the side door of 1202 Baldwin Street and met with CS at his/her vehicle and conducted the

transaction.   CS later told investigators that JORDAN claimed to have 2 kilograms of heroin he

wanted to sell and was planning to meet additional drug customers.   The audio recording of the

heroin transaction between CS and JORDAN was later reviewed.   The recording confirmed that

JORDAN stated he had "two bricks" of heroin to sell, but that he was also looking for the

"white," which I believe, based on my training and experience, was a reference to cocaine.

Further, during CS's buy on July 12, 2018, CS laid the groundwork for the introduction to

JORDAN of a third party interested in buying narcotics, whom investigators intended to be an

11

undercover officer ("UC").    DEA lab analysis confirmed that the substance acquired by CS was

heroin with a net weight of 16.2 grams.

     25.    On July 18, 2018, a DEA UC and CS purchased approximately 50 grams of heroin

from JORDAN.    More specifically, at approximately 6:30 P.M., CS, while in the presence of

the UC and TFOs Paleski and Cameron, called JORDAN at Target Telephone 1 for the purchase

of 50 grams of heroin.    The call was not recorded.    In substance, JORDAN agreed to meet CS

in the Dollar General store parking lot located at 100 Piedmont Street, which is near JORDAN's

then residence of 1202 Baldwin Street, to conduct the transaction.    Prior to traveling to the

Dollar General, the UC and CS-1 were provided with $3,100 in approved funds and an audio

recording device.    The UC and CS then traveled together in CS's car to the Dollar General and

arrived at approximately 6:50 P.M., at which time CS made an outgoing telephone call to

JORDAN advising of their arrival.    A short time later, the UC observed JORDAN approaching

the CS's vehicle on foot and carrying a black box.    JORDAN exchanged a few words with CS

and then entered the Dollar General store.    A few minutes later, JORDAN exited the store with

a plastic bag and got into the rear passenger side of the CS's vehicle.    JORDAN instructed CS-1

to drive around the block because, according to CS-1, he was suspicious of an unknown white

male who was in the parking lot.    As they drove around the block, the UC handed JORDAN

$3,100 in exchange for approximately 50 grams of suspected heroin, described as a light brown,

rock-like substance contained within a plastic bag.    JORDAN then told CS to drop him off at

1202 Baldwin Street, his residence.    Surveillance observed JORDAN get out of CS's vehicle

and enter 1202 Baldwin Street.    DEA lab analysis confirmed that the substance acquired from

JORDAN with a net weight of 50.75 grams.

     26.    On August 1, 2018, a DEA UC purchased approximately 50 grams of heroin from

JORDAN.   More specifically, UC and JORDAN spoke by phone at 2:06p.m. that day.   In

substance, the UC told JORDAN that he/she wanted to purchase 50 grams of heroin.   JORDAN

agreed and stated he would be available later in the day to conduct the transaction.   At

approximately 2:54 P.M., the UC received an incoming call from JORDAN who asked the UC if

he/she could be in Waterbury by 4:00 P.M.   The UC stated that he/she could and advised

JORDAN that he/she wanted the "same thing," referencing the 50 grams of heroin the UC

bought from him on July 18, and JORDAN agreed.   These phone conversations were not

recorded.   At approximately 2:58 P.M., JORDAN texted the UC "Dollar general on Baldwin

St."   The UC then traveled to the Dollar General where he/she parked at approximately 4:12

P.M. and texted JORDAN.   Shortly after, the UC observed JORDAN exit the Dollar General

store and walk to the UC vehicle.   JORDAN then got into the front passenger side of the

vehicle at which time the UC handed him $3,100.   JORDAN reached into his right pants pocket

and handed the UC a clear plastic bag containing a tan colored rock like substance in return.

JORDAN then exited the UC vehicle and surveillance observed him walk toward his residence

of 1202 Baldwin Street.   DEA lab analysis confirmed that the substance acquired by UC was

heroin with a net weight of 50 grams.

     27.     On August 14, 2018, UC purchased approximately 50 grams of heroin from

JORDAN.   More specifically, at approximately 4:10 P.M., the UC engaged in a text message

conversation with JORDAN.   The UC asked, "U around today cuz?" and JORDAN replied,

"Ok what's up".   The UC responded, "Was gonna shoot up to see u real quick".   JORDAN

replied, "Ok same place what time", and the UC told him, "Same if u good." JORDAN replied,

"Ok", and the UC told him, "Bet abt an hour".   The UC then traveled to the Dollar General

store parking lot at 100 Piedmont Street.   At approximately 5:20 P.M., the UC arrived at the

Dollar General and sent a text message to JORDAN advising of his/her arrival:   "Here on the end same spot".   JORDAN replied by text message, "Ok".   Shortly after, surveillance units observed JORDAN exit the front door of his residence at 1202 Baldwin Street and walk to the UC's vehicle in the Dollar General parking lot.   JORDAN got into the front passenger seat of the UC's vehicle at which time the UC handed him $3,100.   JORDAN then reached into his right pants pocket and handed the UC a clear plastic bag containing suspected heroin, described as a tan, rock-like substance.   The UC spoke to JORDAN about the possibility of purchasing 100 grams at a lower price than $62 per gram and came to an understanding that JORDAN would charge the UC $58 per gram if he/she were to purchase 100 grams at a time.   JORDAN then got out of the UC's vehicle and returned to his residence at 1202 Baldwin Street.   The substance acquired was confirmed by DEA lab analysis to be heroin with a net weight 53.9 grams.

28.     On September 12, 2018, UC purchased approximately 100 grams of heroin from JORDAN.   On that date, at 3:29p.m., UC confirmed that JORDAN was "straight for that buck," a reference to 100 grams of heroin and, after JORDAN confirmed that he was, they agreed to meet at the "same spot."   The UC arrived and parked at approximately 3:59 P.M in the Dollar General store parking lot and then texted JORDAN to advise that he/she had arrived.   Soon after, surveillance observed JORDAN exit his residence at 1202 Baldwin Street, walk across Piedmont Street to the Dollar General parking lot, and enter the front passenger seat of the UC's vehicle.   Once in the vehicle, the UC exchanged $5,800 for a light brown rock like substance contained within a clear plastic bag.   Following a brief conversation with the UC, JORDAN exited the UC vehicle and went into the Dollar General store.   JORDAN exited a short time later, walked across Piedmont Street, and went back inside 1202 Baldwin Street.   DEA lab

14

analysis confirmed that the substance acquired was heroin with a net weight of 99.8 grams.

29.   In late September 2018, JORDAN moved his residence to Subject Premises 1 and then continued his prior pattern of utilizing his residence as a base for his drug distribution operations.

30.   On September 29, 2018, JORDAN, using Target Telephone 1, called Kendell JORDAN's phone number 203-206-1544 and, in part, had the following conversation:

K. JORDAN:   "Hello!"
JORDAN:      "So what you need 14 more buns?"
K. JORDAN:   "Bags yeah!"
JORDAN:      "Oh bags?"
K. JORDAN:   "Yeah bags."
JORDAN:      "You ain't got nothing then."
K. JORDAN:   "Nah I don't got nothing."
JORDAN:      "I'm pulling up.   Where you at?
K. JORDAN:   "I'm passing Planet Fitness right now.
JORDAN:      "…You by the house."
K. JORDAN:   "Yeah!"
JORDAN:      "I'll leave it in the mailbox."
K. JORDAN:   "Alright!"

31.   At approximately 6:30 P.M., JORDAN called Kendell JORDAN's phone (session 239) and told him, "Yeah I left it in the mailbox, wrap up with a napkin.   I want my money back too man.   'Cause I already owe this cat paper" and Kendell JORDAN responded, "Alright!" Based on the above conversations, I believe that JORDAN asked Kendell JORDAN if he needed fourteen bundles of heroin ("14 more buns").   From my training and experience, I know that street-level heroin distributors in the Waterbury area commonly refer to ten bag increments of heroin held together by an elastic band as "bundles", "buns", or "bunnies."   Bundles is a unit of sale that is unique to heroin distribution.   K. JORDAN then clarified that he needed fourteen bags of heroin ("Yeah bags") and JORDAN said he would leave the requested heroin in the mailbox at his house, Subject Premises 1.   32.   On October 1, 2018 at approximately 1:57

P.M., JORDAN, using Target Telephone 1, called UM4167 at telephone number 475-689-4167 (session 469).   While the phone was ringing, JORDAN could be heard saying the following to an unknown person:   "Still ahead of you motherfucker…I told you we don't got nobody that come and get one or two buns…We got motherfuckers come to get bricks and shit…I said yeah, but we don't have no spot.   They ain't coming to the house buying one, two at the time."   The call then went to UM6167's voicemail and JORDAN did not leave a message.   Here, in the background conversation, I believe JORDAN was bragging that his drug customers are not buying one or two bundles of heroin at a time, but rather purchase heroin in "brick" quantities. JORDAN also referenced the customers coming to his house, underscoring that he uses his residence as a base of operations.   I am familiar with the term "brick" and know it to be a reference in the Waterbury area to 5 bundles, or 50 individual bags, of heroin.

33.   On October 26, 2018, at approximately 8:17 a.m. (session 6401), JORDAN, utilizing Target Telephone 1, called Katina REED, believed to be his wife and also an indicted co-conspirator, at 203-982-4441, the number for Target Telephone 4.   During the call, JORDAN asked, "Did you talk to Zo?" and REED replied, "I'm going to see him this morning." JORDAN said, "Alright, as soon as you get back, I'm gonna need you to see somebody then…call them you be good" and REED acknowledged, "Alright."   Based on this conversation and what case agents have learned regarding this drug distribution organization, I believe that REED told JORDAN she would be traveling to meet their primary source of heroin (BRIAN HANNA a.k.a. "Zo") during the morning hours ("I'm going to see him this morning").   I also believe that JORDAN told REED he would need her to conduct a drug transaction on his behalf when she returned from her meeting with "Zo" ("I'm gonna need you to see somebody").

34.   At approximately 8:30 A.M., REED was observed via pole camera departing

Subject Premises 1 in her GMC sport utility vehicle.   REED's mother was also in the vehicle. Based on previous intercepts over Target Telephone 1 regarding heroin resupply meets, historical precision location information from Target Telephone 1, and historical information from CS, case agents suspected that REED was traveling to the area of 3377 White Plains Road in the Bronx, New York to be resupplied with heroin by HANNA.   Case agents also suspected that REED's mother resides in the same area.

35.   At approximately 9:32 A.M., JORDAN, using Target Telephone 1 called REED at 203-982-4441, the number for Target Telephone 4 (session 6416).   During the call JORDAN said, "Tina don't forgot you got them two things on you" and she responded, "I know."   Here, I believe that REED left Subject Premises 1 in possession of two bricks of heroin ("them two things") in anticipation of the drug transaction JORDAN previously asked her conduct upon her return to Connecticut.

36.   At approximately 9:48 A.M., surveillance located REED's vehicle traveling southbound on Route 8 in Shelton, Connecticut.   Surveillance was maintained as she continued to and parked in front of 3377 White Plains Road in the Bronx.   At the address, surveillance saw REED and her mother exit the vehicle and go into the apartment building.   At approximately 1:03 P.M., surveillance observed REED exit the apartment building by herself and get into her vehicle.   REED was seen sitting in her vehicle using a cellular phone, continually looking into her side view mirror as if she was expecting someone to pull up next to her.   At approximately 1:24 P.M., surveillance saw a Jeep Grand Cherokee, with Georgia registration CGM3714, park across the street from REED.   Surveillance observed a black male, later identified through his Pennsylvania driver's license photo as Brian HANNA, exit the Jeep, walk across the street while carrying a white plastic bag, and get into REED's front passenger seat.   Approximately two

minutes later, surveillance observed HANNA exit REED's vehicle without the plastic bag, cross the street and get into the Jeep.   HANNA then departed the area.   Based on my training and experience, I believe the short length or the meeting between HANNA and REED, coupled with HANNA transferring custody of the plastic bag to REED, is consistent with a narcotics transaction.   A registration inquiry determined the Jeep to be an Enterprise rental vehicle.   Case agents contacted Enterprise and learned that HANNA had rented the vehicle from Norfolk, Virginia on October 22, 2018.   A criminal history inquiry for HANNA lists his alias as "Ronny Buzo", which I believe to explain his nickname of "Zo".

37.    According to Enterprise, HANNA provided phone numbers 929-308-6124 and 347-683-8593.   Based on toll analysis, REED, using telephone number 203-982-4441, the number for Target Telephone 4, sent a text message to HANNA's 929-308-6124 number on this date at approximately 5:15 A.M.

38.    Surveillance of REED was maintained as she left the Bronx and traveled to Subject Premises 1.   At approximately 4:01 P.M., REED was observed via pole camera entering Subject Premises 1 through the front door. Subsequent intercepts over Target Telephone 1 evidenced that JORDAN and REED had heroin to sell.

39.    On October 26, 2018, at approximately 4:16p.m., JORDAN called Kendell JORDAN, an indicted co-conspirator, at telephone number 203-206-1544.   During the call, it was evident that Kendell JORDAN wanted to obtain heroin for a drug customer.   JORDAN asked, "You need it right now?" and Kendell JORDAN replied, "Yeah!"   JORDAN told him, "Let me see where Tina at, I'll tell her to give you two and I give you one when I get home then" and Kendell JORDAN agreed, "Alright!"   Kendell JORDAN said, "My boy but I ain't going to park, I ain't going with nobody there.   I wasn't going to park by the house" and JORDAN

responded, "I'll tell her you coming for Book."   This call leads me to believe that JORDAN

agreed to supply Kendell JORDAN with three bricks of heroin ("I'll tell her to give you two and

I give you one") and that JORDAN would tell REED the heroin was for a transaction with

Timothy BOOKER a.k.a. "Book," an another indicted co-conspirator.   I suspect that JORDAN

knew REED would be unwilling to give Kendell JORDAN heroin if it was intended for sale with

his personal customer.   I also believe that Kendell JORDAN was with his drug customer, but

did not want to conduct the sale at JORDAN's residence ("My boy" and "I wasn't going to park

by the house").   The fact that JORDAN indicated he would give Kendell another "one" when he

got home again underscores that he stores heroin at his residence, Subject Premises 1.

40.   At approximately 4:17 P.M., JORDAN, using Target Telephone 1, called REED at

203-982-4441, the number for Target Telephone 4 (session 6496).   REED said she was home,

Subject Premises 1, and JORDAN instructed her, "Yo I'm saying take two and you got like a

little gift box, gift bag.   Or something you can wrap something up in?"   REED said she would

go upstairs and check.   JORDAN continued, "Just put in something and give it to Kendell.   He

going to give you 300…I told knucklehead Book to go to Planet Fitness.   He just seen

Kendell…I told him I get two from my brother and have my son bring it to him.   He got the

money right now."   REED questioned, "So why would you involve Kendell?" and JORDAN

explained, "I told Kendell get something to Book for me.   I guess he didn't want to deal with

you, I told him he could have called you."   At approximately 6:01 P.M., JORDAN, using Target

Telephone 1, called Kent Curtis JORDAN, his brother and also an indicted co-conspirator, at

phone number 203-841-5408.   During the call, JORDAN told him, "I'm saying I need you to

run to my house and grab something for Kendell…Tina ain't going to give him nothing.   I'm

going to tell her, to give it you and then you could give it to Kendell" and Kent Curtis JORDAN

agreed.   Based on these conversations, I believe JORDAN asked REED to prepare two bricks of heroin ("take two") for a sale to TIMOTHY BOOKER at Planet Fitness. JORDAN told REED that Kendell JORDAN would give her $300 for the heroin ("give you 300").   I also believe that JORDAN sensed REED may be unwilling to provide the requested heroin, and called Kent Curtis JORDAN to act as an intermediary.

41.   At approximately 6:05 P.M., JORDAN, using Target Telephone 1, called Kendell JORDAN (session 6516).   During the call, JORDAN said, "I got maybe three or four buns in this little bag.   I think is upstairs in the closet…" and Kendell JORDAN replied, "Yeah he wanted eight."   JORDAN asked, "And he with you know?" and Kendell JORDAN confirmed, "Yeah."   JORDAN told him, "I know I don't got eight that's thing is like three or four.   Let me call her…But I don't want her giving you nothing.   I don't want to hear about that later on." Here, I believe Kendell JORDAN said his customer wanted to buy eight bundles of heroin ("he wanted eight"), but JORDAN believed he only had three or four bundles at Subject Premises 1. At approximately 6:19 P.M., Kent Curtis JORDAN called JORDAN at Target Telephone 1 (session 6518) and, in substance, said he was on the way to Subject Premises 1 to meet Kendell JORDAN.   JORDAN then called Kendell JORDAN about one minute later (session 6521) and told him to wait outside with his customer and that Kent Curtis JORDAN would meet him with the heroin.

42.   At approximately 6:21 P.M., JORDAN, using Target Telephone 1, called REED at 203-982-4441, the number for Target Telephone 4 (session 6522) and said, "KJ is going to come see you…just give him three movies" and she agreed, "Okay!"   I believe REED agreed to provide Kent Curtis JORDAN ("KJ") with three bricks of heroin ("three movies") upon his arrival. At approximately 6:33 P.M., surveillance observed a white Chevy Suburban arrive at

Subject Premises 1.   Previous intercepts have determined that Kent Curtis JORDAN operates a white Suburban.   Surveillance saw a black male exit the vehicle and walk toward and into Subject Premises 1.   At approximately 6:36 P.M., physical surveillance observed the same black male, later identified as Kent Curtis JORDAN, walk out the front door of the Subject Premises 1 get into the driver's side of the Suburban.   Surveillance observed a different black male, later identified as Kendell JORDAN, walk up to the passenger side of the Suburban and open its front door.   Shortly after, this male walked away from the passenger side of the Suburban and toward a Buick sedan bearing Connecticut registration 969TSW that was parked nearby.   Surveillance observed the Buick to be occupied by a white male later identified as Gilman Blanchette. Following a brief meeting with Blanchette, Kendell JORDAN walked away from the Buick and back towards the Suburban.   Surveillance observed money in Kendell JORDAN'S hand as he approached the Suburban.   The Buick and Suburban then both departed the area.   Surveillance began to follow the Buick in anticipation of a coordinated motor vehicle stop by the Waterbury PD, but lost sight of it near the Waterbury city line for a period of time.   At approximately 6:39 P.M., JORDAN answered a phone call from REED (session 6532) in which she stated Kent Curtis JORDAN had already come to Subject Premises 1.   Based on the observation of surveillance units and the referenced intercepts, I believe Kent Curtis JORDAN arrived at Subject Premises 1 in the Suburban, went inside Subject Premises 1 and obtained three bricks of heroin from REED.   I also believe that Kendell JORDAN walked to the passenger side of the Suburban to meet with Kent Curtis JORDAN, who gave him eight bundles of heroin to sell to Blanchette.   Finally, I believe that Kendell JORDAN conducted the transaction with Blanchette and was observed walking back to Kent Curtis JORDAN's Suburban holding the cash proceeds of the sale in his hand.

43.   At approximately 6:59 P.M., surveillance located the Buick in the parking lot of Taco Bell located at 973 Wolcott Street in Waterbury.   At approximately 7:00 P.M., WPD patrol officers conducted a motor vehicle stop of the Buick due to suspicious activity.   During the course of the stop, Blanchette was identified as the sole occupant and found in possession of seven bundles of heroin stamped with the phrase "Say Less" and hypodermic needles. Blanchette was arrested by WPD officers for multiple State of Connecticut narcotics violations. I believe that during the period of time following the heroin sale that BLANCHETTE was surveilled, he may have sold one bundle of heroin to an unknown person or concealed it somewhere on his person that would be difficult to find.   This would account for WPD officers finding seven bundles instead of the eight bundles he was believed to have purchased.

44.   On November 3, 2018 at approximately 6:29 A.M., JAMES TYRONE HAYES, an indicted co-conspirator, texted JORDAN at Target Telephone 1 (session 8639), "4 ASAP". Here, I believe HAYES requested to purchase four bricks of heroin from JORDAN as soon as possible.   From what I have learned about HAYES from previous intercepts over Target Telephone 1, I know that he prefers to purchase heroin in brick-quantities and typically meets JORDAN in the parking lot of the Danbury Fair Mall in Danbury, Connecticut to conduct drug transactions.   At approximately 7:50 A.M., JORDAN, using Target Telephone 1 (session 8671) texted HAYES, "Yo iam leaving in 10 min…"   HAYES replied by text message (session 8673) at approximately 7:51 A.M., "On my way!"   At approximately 8:09 A.M., JORDAN was observed via pole camera departing Subject Premises 1 in a Volvo sedan.   At approximately 8:14 A.M., JORDAN, using Target Telephone 1, called HAYES (session 8690).   During this call, JORDAN said, "Yo, I'm at a stand still now I just passed, I just passed Southbury exit. They cleaning up the road" and HAYES responded, "That's crazy, I'm on my way."   At

approximately 8:55 A.M., HAYES called JORDAN at Target Telephone 1 (session 8703) and said, "I'm sitting right by the gas.   You still at a standstill?"   JORDAN replied, "Alright I'll be there in like ten minutes."   At the same time, surveillance observed a black Cadillac sedan bearing Virginia registration VZX1168 parked near a Tesla electric charging station in the parking lot of the Danbury Fair Mall.   The Cadillac was occupied by a black male, later identified as HAYES.   A registration inquiry determined the vehicle to be registered to HAYES.

45.     At approximately 9:04 A.M., surveillance saw JORDAN's Volvo arrive and park next to the Cadillac.   Surveillance observed JORDAN exit the Volvo carrying a brown bag and enter the front passenger door of the Cadillac.   Approximately one minute later, JORDAN exited the Cadillac and got back into the Volvo.   At approximately 9:07 A.M., both vehicles left the parking lot.   Surveillance of the Cadillac was maintained as it continued to Interstate 84 East in anticipation of a coordinated motor vehicle stop by the New York State Police (NYSP). A NYSP Trooper conducted a motor vehicle stop on HAYES' Cadillac on Interstate 84 in the area of Fishkill, New York, for motor vehicle violations.   During the course of the stop, Troopers detained HAYES for impersonating a police officer.   According to police records, HAYES showed Troopers a City of Richmond, Virginia Sherriff's Office badge, but when questioned if he was a police officer, active or retired, HAYES stated, "no".   Following a positive K-9 alert on HAYES' vehicle, Troopers searched it and located four bricks of heroin concealed inside a sock.   The heroin was stamped with the phrase "Say Less".   HAYES was arrested on various State of New York charges.

46.     On November 13, 2018, at approximately, 4:10p.m., JORDAN spoke to David Strumpf and agreed to meet him at Shop Rite in Waterbury.   In a subsequent call at 4:29p.m.,

23

Strumpf and JORDAN agreed to "15."   At 4:30p.m., DEA TFO Joseph Massetti observed

JORDAN exit Subject Premises 1 and get into a Volvo.   TFO Massetti then followed JORDAN

from Subject Premises 1 to a Shop Rite on Wolcott Road in Waterbury.   Other surveillance

team members observed the same Volvo pull into the shopping plaza parking lot and drive

around the lot and eventually pull next to a Black Nissan Xterra.   A white male then exited the

Nissan and got into the front passenger side of the Volvo.   Within a minute, the white male got

out of the Volvo and got back into the Nissan.   The Volvo drove off.   Surveillance followed

the Nissan as it left the parking lot.   Eventually, Waterbury Police executed a traffic stop and

the occupant, David Strumpf, was found in possession of 14 wax folds of suspected heroin,

stamped with "the Hulk."   Based on intercepts, this was a brand of heroin that JORDAN had

previously acquired from PEDRO SANTOS.

    47.   On November 30, 2018, JORDAN spoke to REED utilizing Target Telephone 1.   In

substance, during the above intercepted conversation, JORDAN and REED had a mostly non-

pertinent conversation. REED then asked JORDAN when they were going to New York.

JORDAN in turn indicated that he was probably going to go the same evening, November 30,

2018.   REED then indicated to JORDAN that he would need her there in New York.   JORDAN

then told REED that he did not need her with him and that he did not want her with him. Based

on the investigation to date, it is believed that REED communicates with Brian HANNA a.k.a.

"ZO" in an effort to get re-supplied with heroin, hence why she told JORDAN that he will need

her to go to New York with him. Furthermore, REED has been observed by law enforcement

meeting with HANNA in the area of 3377 White Plains Road, Bronx, NY to get re-supplied with

heroin. Based on this intercepted telephone call between JORDAN and REED, surveillance was

initiated on the both of them in an effort to surveil them during the re-supply of heroin.

Surveillance observed throughout the evening hours of November 30, 2018 that neither

JORDAN nor REED traveled to New York and were inside Subject Premises 1 throughout the

night. This was also corroborated by precise location data on Target Telephone 1.

48.      On December 1, 2018, JORDAN placed an outgoing call to REED. During the

call, JORDAN stated that he got down to New York safely but was stuck in traffic on his way

back near Exit 21.   Based on this intercepted call, it is believed that JORDAN already

traveled down to New York and met with HANNA and was on his way back to the Waterbury

area with a re-supply of heroin. Subsequently, TFO Joshua Cameron was able to check historical

precise location data for Target Telephone 1 which revealed that JORDAN left **Subject**

**Premises 1** around 4:20 A.M. and that he traveled directly to 3377 White Plains Road,

Bronx and arrived at approximately 5:35 A.M. TFO Cameron further observed that JORDAN

stayed in the area of 3377 White Plains Road, Bronx for approximately 20-25 minutes and then

he started to travel north towards Connecticut. Based on the intercepted calls and the very short

duration JORDAN stayed in the Bronx, NY it is believed that JORDAN received a re-supply of

heroin and would be traveling back to the Waterbury area with a substantial amount of pre-

packaged heroin.   Based on the above belief of a re-supply of heroin, surveillance was deployed

in the areas of I-95 North and Route 8 in Connecticut in an effort to locate JORDAN traveling

back from New York. At approximately 7:45 A.M., GS Jon Rubinstein observed JORDAN

traveling North on I-95 in the area of the Fairfield/Bridgeport line operating his black

GMC Terrain bearing CT registration AM12247. GS Rubinstein maintained surveillance on

JORDAN as he traveled onto Route 8 North from I-95 North. Surveillance then continued on

JORDAN until he exited Route 8 in Ansonia and traveled onto Wakelee Avenue,

Ansonia.   Surveillance was maintained on JORDAN while on Wakelee Avenue where he was

observed making several counter surveillance maneuvers in an effort to avoid being followed by law enforcement.   After surveillance observed these maneuvers several times, the decision was made for a motor vehicle stop of JORDAN's vehicle. Agents, who was operating an unmarked government vehicle, but which was outfitted with lights and sirens, attempted to pull JORDAN over. JORDAN refused to yield to law enforcement attempt to pull his vehicle over and traveled through several side roads in an effort to elude law enforcement. After a short low speed pursuit of JORDAN, he pulled over for agents in the area of Clarkson Street and Wakelee Avenue. During a subsequent search of the vehicle, law enforcement observed in the trunk near the spare tire a brown paper bag containing a large amount of pre-packaged heroin, subsequently found to be 65 bricks (3,250 single dosage bags) of heroin.   In light of the on-going wiretap investigation including intercepts of DOMINGO ALVES and PEDRO SANTOS, who were sources of supply to JORDAN, JORDAN was not charged either state or federally at this time.

49.     On October 4, 2018 at approximately 3:38 P.M., ALVES, using Target Telephone 2, called JORDAN at Target Telephone 1 (session 1018).   They engaged in an approximately eleven minute conversation during which they discussed heroin acquisition and distribution. During the conversation, JORDAN told ALVES, "I can make money with my people, 'cause they give it to me for 48-50, all day long, I can sell for 60, make 10 cents" and ALVES responded, "Damn…wow, yeah, that's good."   This leads me to believe that JORDAN is buying heroin from his primary source (HANNA) for $48 to $50 per gram and is reselling it for $60 per gram, yielding a $10 per gram profit.   I also believe that ALVES acknowledged that $48 to $50 per gram is a good price ("that's good").   JORDAN went on to say, "The nigga get it for 40!" which I believe means that JORDAN's source of supply obtains heroin for $40 per gram and is therefore profiting $8 to $10 per gram from sales to JORDAN.   ALVES stated, "I talk to

26

the dude down there, gotta be fire man" and JORDAN replied, "No not mediocre, if it's fire, you

gonna eat good!   If it's mediocre, everybody got it."   ALVES went on to say, "Need some fire,

all that shit, Baltimore, Waterbury kilos…we are the capital now…remember Baltimore?"

JORDAN agreed and exclaimed, "But now New Haven, Hartford and Bridgeport can't even

touch Waterbury…and Waterbury got it messed up."   ALVES interjected, "fentanyl and shit"

and JORDAN stated, "Nah, I ain't touchin' none of that."   JORDAN said, "I take two little

bit…of two different people that was ok and mix it together and then it be alright" and ALVES

agreed, "Yeah."   Here, I believe that JORDAN stated the best way to profit ("eat good") is by

selling high quality heroin ("fire").   I also believe that ALVES remarked that he is in search of

high quality kilogram-quantities of heroin ("Need some fire" and "Baltimore, Waterbury kilos").

"Fire" is very common drug jargon for high quality narcotics.   JORDAN and ALVES seemed

to agree that Waterbury is the currently the epicenter of heroin distribution in Connecticut ("we

are the capital now"), but some distributors in Waterbury are ruining things ("Waterbury got it

messed up") by adulterating heroin with fentanyl ("fentanyl and shit").   Based on these

comments, it is clear that JORDAN is not interested in selling fentanyl and would rather mix

high-grade heroin with a less potent grade heroin to obtain a suitably strong mixture ("it be

alright") than to adulterate the low-grade heroin with a synthetic opioid.   The conversation

continued about an individual identified as "Markie".   JORDAN warned ALVES that "he get

some garbage and come see you then…and then drop it all off on you."   ALVES responded that

"Markie" owed him $3,100 for a year after "he got some stuff", which, based on the context of

their discussion, I infer is heroin.   The conversation concludes by ALVES stating, "Alright let

me know somehin', I gotta get rid of these buns" and JORDAN replies, "Alright, give me a

minutes."   Here, I believe that ALVES has bundles of heroin he is trying to distribute ("get rid

of these buns") and wants to know if JORDAN wants to buy them ("let me know").

50.     On October 9, 2018 at approximately 11:19 A.M., JORDAN sent a text message

from Target Telephone 1 to ALVES at Target Telephone 2 (session 2193) asking, "You got

something".   Immediately after, ALVES, using Target Telephone 2, responded by text message

(session 2195), "I told u will come 4 hour."   At approximately 11:20 A.M., JORDAN asked

ALVES by text message sent from Target Telephone 1 to Target Telephone 2 (session 2198), "U

got bricks".   ALVES, using Target Telephone 2, responded by text message at approximately

11:21 A.M. (session 2200), "Ran out!   Hopefully today what they won't."   At approximately

11:22 A.M., JORDAN texted ALVES at Target Telephone 2 (session 2202), "3," and ALVES,

using Target Telephone 2, responded by text message (session 2206), "Lance got it."   Based on

this text message exchange, I believe that JORDAN wanted to buy three bricks of heroin from

ALVES ("bricks" and "3"), but ALVES was sold out and would not have any bricks available

for about four hours ("4 hour").   ALVES told JORDAN that "Lance," who I believe to be

indicted co-conspirator Lance BAPTISTE (whom ALVES also supplied), had bricks of heroin

available if JORDAN needed it now ("Lance got it").

51.     On October 13, 2018 at approximately 10:07 A.M., JORDAN sent a text message

(session 3260) from Target Telephone 1 to ALVES at Target Telephone 2 asking, "Yo you got

stuff."   Then, at approximately 10:54 A.M., ALVES, using Target Telephone 2, called

JORDAN at Target Telephone 1 (session 3278).   In part, JORDAN asked, "You got any buns?"

and "Now what are you charging a brick?"   ALVES replied, "150" and JORDAN complained,

"You know I can't make nothing off of that."   JORDAN argued, "Motherfuckers got shit for

140, 150, how am I gonna charge 160?" and "I thought you might have had a couple…I just

wanted to dump them…nobody that charging no 180."   Here, I believe that JORDAN asked

ALVES if he had any packaged heroin ("buns") and for his pricing per brick of heroin.   ALVES said he was charging $150 per brick which upset JORDAN because he would be unable to resell them for $160 to $180 to make a suitable profit ("can't make nothing" and "nobody that charging no 180"), based on his competitors charging $140 to $150 ("motherfuckers got shit for 140, 150").   The discussion continued with ALVES telling JORDAN that some distributors are "charge 200," which I believe is a reference to $200 per brick of heroin.   JORDAN stated, "Somebody charged you 200 in Waterbury?" and "Them niggas is crazy."   ALVES then offered to "go grab something" and for JORDAN to "come over here throw it together." JORDAN stated, "I could use like fuckin' 200 buns right now...that shit took forever to put together."   JORDAN and ALVES then agreed to meet.   Based on my training and experience as well as information gathered regarding this drug trafficking organization to date, I believe that JORDAN was looking to buy 2,000 bags of heroin (200 bundles).   I also believe that ALVES said he could acquire the necessary raw heroin ("grab something") and that JORDAN could package the narcotics at his address ("come over here throw it together").

52.   JORDAN also had a heroin source in PEDRO SANTOS.   On October 9, 2018, JORDAN and SANTOS, using Target Telephone 3, engaged in a lengthy series of phone calls and text messages intercepted over Target Telephone 1 evidencing that JORDAN was trying to obtain heroin from SANTOS.   At approximately 2:01 P.M., JORDAN texted SANTOS (session 2286), "Need one now house" and SANTOS responded by text message (session 2288), "OMW into town."   At approximately 2:16 P.M., JORDAN texted SANTOS (session 2305), "3 houses," which I believe to be a coded phrase for a quantity of 3 bricks of heroin.   Subsequent intercepts suggested that SANTOS sent a runner to conduct the transaction with JORDAN.

53.   Later that same day, October 9, at approximately 5:47p.m. (session 2417),

JORDAN texted SANTOS that "Yo, it's short 3 buns."   Here, I believe that SANTOS had

provided a quantity of heroin to JORDAN and JORDAN was letting SANTOS know that what

he actually got was short 3 bundles on the requested quantity.     At approximately 7:58 P.M.,

SANTOS called JORDAN (session 2467).   JORDAN and SANTOS argued during the

conversation on where they should meet.   SANTOS, apparently frustrated with JORDAN, told

him, "Tudor ain't the other way…come on!   I got, I got like 150 bricks on me and you want

three bundles!   Where you want me to go!"   JORDAN responded, "I need you right there, I'm

comin' up Hill Street now…I go to Tudor if you want" and   SANTOS replied, "Well I'm right

here…parked right here in front of this store…come on man."   SANTOS stated, "I don't see

you, Knowledge" and JORDAN told him, "I'm pullin' right behind you, I can see you."

SANTOS instructed JORDAN, "Right here, come get it…Got 150 bricks in the car you want me

to get out!"   Based on my training and experience as well as information regarding this

organization to date, I believe that in the conversation SANTOS said he had 150 bricks of heroin

(7,500 bags) of heroin in his possession and was upset to be waiting for JORDAN who only

wanted to obtain the three bundles of heroin he had been shorted from the earlier transaction.

54.     On October 12, 2018 at approximately 5:19 P.M., JORDAN called SANTOS

(session 3126).   During the call, JORDAN said, "Yo he just asked me is it as good as the

Hulk?" and SANTOS replied, "Yes, as matter fact come get, I'ma give you half a bun and if they

like then (unintelligible) if they don't like then leave it alone."   JORDAN asked how long it

would take SANTOS to see him and SANTOS said, "Like about 15 minutes…But you got to

give me a minute, to put the grinder and do all that."   Here, I believe that JORDAN, who

wanted to acquire heroin on another's behalf ("he just asked me"), asked SANTOS if the heroin

was as potent as the previously purchased Hulk-stamped heroin.   SANTOS said the heroin was

30

just as good ("yes") and offered to provide JORDAN with half a bundle as a sample ("half a

bun" and "if they like").    SANTOS told JORDAN he had to prepare the heroin by mixing it in a

grinder ("put the grinder") and complete the packaging process ("and do all that") before

traveling to meet him.    It is common for heroin distributors to mix heroin with "cut" in food

grinders prior to packaging.    I know "cut" to be a term for an additive, such as lactose or

caffeine powder, that when mixed with heroin increases its volume, which in turn generates

greater profits for the distributor.

56.     At approximately 5:22 P.M., JORDAN called SANTOS (session 3127) and

advised, "He said the last one was not garbage.    He said it was good, so he'll take three.    He'll

take three bricks."    SANTOS replied, "I'm on my way to that Knowledge."    JORDAN sent a

text message to SANTOS immediately after this call (session 3128) and said, "Just make them

nice size".    JORDAN said he would purchase three bricks of heroin and SANTOS agreed.

JORDAN then instructed SANTOS to make sure the individual baggies contained a good

amount of heroin ("nice size").

56.     At approximately 6:31 P.M., JORDAN called SANTOS (session 3152).

SANTOS complained, "Yo bro, you can't me rushing me man.    You know what I'm doing right

now and I can't".    JORDAN interrupted, "Listen, I didn't know you had to go put all that shit

together for all three, I thought you already had some."    SANTOS explained, "No I told you,

those shits are going like water (unintelligible) 100 for that business, then the next nigga came

and got that.    So I don't got no more bags for the Hulk that's what I'm telling you.    I got the

VIP.    I've been sitting here doing what I'm doing.    You don't hear that shit in my voice man?"

JORDAN responded, "Nah man, put some work into it.    You ain't no new jack nigga, you're

old school, that shit should have been done by now."    SANTOS replied, "Yeah, but I don't trust

nobody, so I do my own shit...I got you"    Based on this exchange, I believe SANTOS was in

the process of packaging the heroin when JORDAN called ("doing right now"), which surprised

JORDAN who believed SANTOS had three bricks of heroin ready when he initially placed the

order ("already had some").    SANTOS said his heroin was selling fast ("like water") and had

just sold the remaining Hulk-stamped bundles ("next nigga came and got that" and "no more

bags for the Hulk").    SANTOS said he was currently packaging heroin in baggies stamped

"VIP" and asked if JORDAN could hear in his voice that he had been bagging heroin ("hear that

shit in my voice").    I know that in heroin mills, individuals involved in the mixing and

packaging process will often wear face masks to protect themselves from inhaling heroin and

other additives which may become airborne.    JORDAN complained that SANTOS should

accomplish the task faster ("put some work into it" and "should have been done") because he is

experienced in heroin packaging ("old school").    In a subsequent series of calls and text

messages between JORDAN and SANTOS, it was apparent that the deal did not occur because

SANTOS went to the emergency room for a medical emergency he suffered due to the poor

ventilation in the suspected heroin mill.

57.    On October 23, 2018 at approximately 5:47 P.M., SANTOS using Target

Telephone 3 called JORDAN (session 5851) and stated, "Yo.    Yo, Hulk out."    JORDAN

asked, "Huh?" and SANTOS repeated, "I said, the Hulk is back out."    JORDAN acknowledged,

"Yeah" and SANTOS said, "Alright."    During this brief exchange, I believe SANTOS told

JORDAN he had heroin stamped with the name or image of "The Hulk" available for purchase.

58.    Between July 2018 and December 1, 2018, JORDAN had a pattern of utilizing his

residence as a base of his narcotics distribution operations, first 1202 Baldwin Street in

Waterbury and then Subject Premises 1 after he moved in late September 2018 to Wolcott, CT.

59.     On March 13, 2019, the Honorable Robert M. Spector authorized an arrest warrant for Keith JORDAN and Katina REED. Both were charged with Conspiracy to Distribute, and to Possess With Intent to Distribute, Heroin, Cocaine and Cocaine Base.

60.     On March 19, 2019, the Honorable Robert M. Spector authorized a search warrant for Subject Premises 1.

61.     On March 20, 2019, members of the DEA executed the arrest warrants for JORDAN and REED as well as the search warrant for Subject Premises 1. At approximately 6:00 a.m., participating personnel approached the front door of Subject Premises 1. All personnel were wearing clearly marked and clearly visible law enforcement identification. DEA personnel then knocked on the front door several times and announced, "Police with a Search Warrant." There was no response. The door was forcibly opened. JORDAN and REED were arrested in the third floor bedroom without incident.

62.     JORDAN and REED were brought into the living room where they were met by law enforcement personnel. There, a DEA member gave JORDAN and REED their *Miranda* warnings verbally, via DEA Form 13. Both JORDAN and REED stated that they understood their rights.

63.     A DEA member asked JORDAN where his cellular telephone was and what was the number. JORDAN stated that his phone was in his bedroom and the number was 347-742-9292. REED was asked the same. REED stated that her phone was in her bedroom plugged in and that her number was 203-982-4441 (Target Telephone 4). DEA members retrieved both phones. JORDAN identified Target Telephone 1 as his cell phone and Target Telephone 4 as REED's cellphone. DEA members then seized Target Telephones 1 and 4 pursuant to the warrant.

33

64.    Based on the forgoing, there is probable cause to believe, and I do believe that JORDAN and REED committed violations of Title 21 U.S.C. §§ 841(a)(1) and 846 and that there is probable cause to believe that electronically stored information described herein and in the attachment hereto is recorded on Target Telephones 1 and 4 and constitutes evidence, fruits, and instrumentalities of these offenses.

65.    Based on my training and experience, and consultation with, and information from other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know the following information tends to exist on wireless telephones, including wireless telephones utilized by those engaged in narcotics trafficking activities:

    a.   the telephone call number and other identifiers (ESN number, IMSI, IMEI,   MEID, and SIM card number) associated with said device/s;

    b.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

    c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

    d.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

e.  information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

f.  GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

g.  saved searches, locations, and route history in the memory of said device/s; and,

h.  internet browsing history, to include, internet searches in the memory of said device/s.

## TECHNICAL TERMS

66.     Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I use the following technical terms to convey the following meanings:

67.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars;

and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

68.     Based on my training and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that the Target Telephones 1 and 4 possess some of the capabilities associated with wireless telephones, as listed above.   In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

69.     Based on my knowledge, training, and experience, and consultation with, and information from, other law enforcement sources, including sources with expertise pertaining to the features and functionality of cellular telephones and computers, I know that electronic devices can store information for long periods of time.   Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.   This information can sometimes be recovered with forensics tools.

70.     As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Device was used, the purpose of its use, who used it, and when.   There is probable cause to believe that this forensic electronic evidence might be on the Target Device because:

  i.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

j. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## NATURE OF EXAMINATION AND MANNER OF EXECUTION

71.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Devices 1 and 4 consistent with the warrant.

37

The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.   Based on the above, there is probable cause to believe, and I do believe, that Target Devices 1 and 4 contain stored electronic information, including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers, and other electronic information as outlined in Attachment B, that will assist law enforcement in this investigation and which is evidence of the violations of the above.

72.     Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.   Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night

JOSHUA CAMERON
TASK FORCE OFFICER
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to before me this 30th day of September 2019, at New Haven, Connecticut.

/s/ Robert M. Spector

HONORABLE ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**TARGET TELEPHONE:**

    a.  **Target Telephone 4:** Apple iPhone, which utilized number 203-982-4441, which is currently in DEA custody as Exhibit N-61.

## ATTACHMENT B

The items to be seized include:

All stored electronic information concerning violations of Title 21 U.S.C. §§ 846 and 841(a)(1), including telephone numbers, digits, names, text messages, photographs, videos, identifying information such as telephone numbers and serial numbers, the originating telephone numbers and other electronic information stored in the TARGET TELEPHONE 1, including:

A.   the telephone call number and other identifiers (ESN number, IMSI, IMEI, MEID, and SIM card number) associated with said device/s;

B.   call logs/histories, numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images and videos stored in the memory of said device/s;

C.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described offenses;

D.   records which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

E.   information showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

F.   GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software;

G.   saved searches, locations, and route history in the memory of said device/s; and,

H.   internet browsing history, to include, internet searches in the memory of said device/s.